UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| STEVEN R. HILL, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 3:06-CV-786 RM |
| | ) | |
| ZIMMER, INC., | ) | |
| | ) | |
| Defendant | ) | |

<u>OPINION AND ORDER</u>

This cause is before the court on the motion of Zimmer, Inc. for summary judgment on Steven Hill's claims against it. Mr. Hill claims Zimmer discriminated against him and terminated him in retaliation for taking leave under the Family and Medical Leave Act ("FMLA") in violation of 29 U.S.C. § 2601 *et seq.* Mr. Hill also claims that Zimmer knowingly failed to take reasonable steps to assure that its third party health plan administrator provided Mr. Hill notice of his rights pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). 29 U.S.C. § 1166(a)(2).[1] Mr. also Hill moves for leave to file a surreply in response to Zimmer's motion for summary judgment. For the reasons that follow, the court grants Zimmer's summary judgment motion and denies Mr. Hill's motion for leave as moot.

I. Factual Background

---

[1] In his response in opposition to Zimmer's summary judgment motion, Mr. Hill abandoned his claims for violation of his rights under the Age Discrimination in Employment Act and the Americans with Disabilities Act.

The following facts are taken from the summary judgment record and are viewed in the light most favorable to Mr. Hill, the nonmoving party. Mr. Hill began working as a second shift production machinist at Zimmer's Warsaw, Indiana facilities on May 8, 2001. Mr. Hill continued in this position until his termination on December 15, 2005. Mr. Hill worked primarily in the Titanium Hip Machining Department, and his responsibilities consisted of setting up machines, inspecting products, and keeping production items running through machining areas. His duties also required him to sign off on a Measurement Instruction Sheet ("MIS") to verify that all required inspections were performed and that he produced the correct product. Mr. Hill interacted with numerous supervisors including Human Resources Manager Timothy Shuman, Manufacturing Manager Todd Puckett, and Senior Supervisor Rodney Roberts.

FMLA Leave. Mr. Hill suffered from various health conditions, which required him to take time off from work periodically. Mr. Hill missed about ten days of work per year due to chronic asthma. Mr. Hill also took leave in June 2002 after suffering a heart attack and took additional leave in June 2005 in connection with his coronary artery disease. Shortly before his termination, Mr. Hill missed work in November 2005 due to a shoulder injury. Mr. Hill also needed time off from work in 2004 and 2005 to care for his wife, Brenda, after she suffered a stroke. Mr. Hill took leave under the FMLA on each of these occasions.

Mr. Hill's supervisors, including Timothy Shuman, monitored and kept track of Mr. Hill's FMLA use, requests, and documentation. Zimmer used Mr. Hill's

2

employee attendance calendar to compile its FMLA date records. Zimmer's 2005 employee attendance calendar indicates that Mr. Hill used 198 hours of FMLA leave that year. The corresponding FMLA date records, however, show that Zimmer deducted 278 hours of FMLA leave from Mr. Hill in 2005. Mr. Hill argues that this inconsistency supports an inference of discrimination; Zimmer notes that the extra hours reflect leave taken from November 21 through November 29, including the Thanksgiving holiday. Zimmer explains that these hours were subtracted pursuant to the FMLA's implementing regulations. Mr. Hill also claims that because Zimmer's 2004 employee attendance calendar is missing, there can be no comparison with the FMLA date records, and Mr. Hill is entitled to an inference that the calendar was purposely hidden or destroyed in order to "reduce the chance of improper deductions being made from Mr. Hill's 2004 FMLA allotment."

Mr. Hill further claims that Senior Supervisor Rodney Roberts treated him harshly when he took leave in 2002 after his heart attack and that this treatment significantly worsened when Mr. Hill took leave to care for his wife in 2004 and 2005. Mr. Hill says that Mr. Roberts tried to discourage him from taking leave and argued with him over whether his wife's illness was an acceptable reason to miss work.

Job Performance History. During his employment, Mr. Hill received two semi-annual reviews, which indicated that he met or exceeded Zimmer's expectations for various performance criteria. Nevertheless, Mr. Hill was subject

3

to two disciplinary actions for failing to follow work procedures. In February 2003, Mr. Hill received a Final Written Warning and a ten-day unpaid suspension for machining nonconforming parts and failing to complete Zimmer's inspection procedures properly. In particular, Mr. Hill signed off on the MIS verifying that all required inspections had been performed even though the parts produced were not correct. Mr. Hill admitted at his deposition that he signed the MIS without checking whether the parts conformed to specifications. The written warning noted that termination would result from another similar error, and Zimmer required Mr. Hill to repeat the certification process for machining hip products.

On November 8, 2005, Mr. Hill again machined nonconforming parts and signed off on the MIS, even though the products contained noticeable defects. Mr. Hill states that when he started his shift, he worked on a machine that another employee had used to run nine out of twelve parts of an order. Mr. Hill produced the last two parts of that order, then ran nine more parts for the next order. Mr. Hill checked the machine throughout his shift and noticed part of the machine was loose. After making this discovery, he checked the parts that had already been completed and noticed a groove across them. Mr. Hill maintains that he tagged the nine parts that he had run and placed them on a hold shelf for the plant engineers to examine.

The next day, coworkers told Mr. Hill that there were concerns with the parts that had grooves in them. Mr. Hill asked Mr. Roberts about the issue, and Mr. Roberts told him that management was still investigating the matter. Mr. Hill

4

claims that the third shift supervisor, Mike Albert, possibly with Mr. Roberts, had him demonstrate how he had inspected the parts. Daniel Serna, another employee on the third shift the night of November 8, says he worked on the same machine as Mr. Hill and saw one of the parts that had allegedly gotten past Mr. Hill's inspection. Mr. Serna says that the part had no immediately visible defects.

On November 14, Mr. Hill took time off from work due to a shoulder injury. When he returned on November 30, Mr. Hill met with Mr. Roberts, Mr. Puckett, Mr. Shuman, and the second shift supervisor, Shawn Ferguson. The supervisors confronted Mr. Hill about the nonconforming parts as well as a box of unmarked parts, which Mr. Hill contends he was accused of producing and passing through inspection. Mr. Hill says he had seen this same box of unlabeled parts in Mr. Roberts' office. At the meeting, Mr. Hill demonstrated how he had inspected the parts and claimed that he must have missed the grooves by covering the part where the notch appeared on the corresponding overlay with his hand. Mr. Hill acknowledged at his deposition that he wasn't checking the parts adequately and that he didn't do a proper inspection. At the end of the meeting, Mr. Hill received a second Final Written Warning and was suspended indefinitely without pay.

Mr. Hill's Termination. After examining the nonconforming parts and hearing Mr. Hill's explanation, Mr. Puckett and Mr. Shuman concluded that Mr. Hill either did not conduct the inspection for which he signed the MIS or that he

conducted the inspection in a grossly negligent manner.[2] Zimmer maintains that this determination, along with Mr. Hill's prior disciplinary record, led to the decision to terminate Mr. Hill's employment. Zimmer terminated Mr. Hill on December 15, 2005 and named Michael Mitchell as his replacement.

Zimmer contends that the decision to terminate Mr. Hill was based solely on his performance and not on the basis of his medical condition, age, or use of leave under the FMLA. Zimmer further claims that, since Mr. Shuman became responsible for the Titanium Hip Machining Department in September 2002, it terminated each of the three employees who twice signed an MIS either without performing an inspection or performing the inspection in a grossly negligent manner. In addition to Mr. Hill, Zimmer says that it also terminated Ronald Grube and William Helms, both of whom received a Final Written Warning after the first instance in which they improperly signed an MIS.

Mr. Hill, on the other hand, alleges that Zimmer skipped steps in its progressive discipline policy when it issued a Final Written Warning without first progressing through other disciplinary stages. Mr. Hill says Zimmer should have "rolled off" his prior disciplinary action a year after being issued. In so arguing, Mr. Hill points to other employees who were not similarly terminated after being accused of producing defective products or conducting improper inspections. Mr.

---

[2] Zimmer notes that the fact that the grooves were plainly visible led Mr. Puckett and Mr. Shuman to conclude that the defects could not have been missed nine times by any reasonably competent inspection. Neither Mr. Puckett nor Mr. Shuman believed Mr. Hill's explanation that he must have covered the portion of the overlay that would've revealed the groove on each of the nine parts inspected.

Hill also contends that Mr. Roberts harbored animosity toward him for taking FMLA leave and retaliated against him as a result. Mr. Hill says Mr. Roberts was actively involved in the investigation of the November 8 incident and had control over the defective parts alleged to have passed through his inspection.

COBRA Claim. In October 2005, Mr. Hill notified second shift supervisor Ken Tellis that his home had been destroyed in a fire and gave Mr. Tellis his updated address information. After Mr. Hill's termination, Zimmer notified COBRA Compliance Manager Jason Trimble that Mr. Hill had a COBRA qualifying event. Although the third party plan administrator sent Mr. Hill a notice of his COBRA rights on December 28, 2005, Mr. Hill claims he never received the necessary paperwork because Zimmer knowingly did not provide Mr. Hill's updated address to Mr. Trimble. Mr. Hill says that he tried to contact Mr. Shuman numerous times to discuss his insurance coverage, but Mr. Shuman never responded. Ultimately, Mr. Hill lost his insurance coverage, which he claims he would have otherwise retained if he was aware of the necessary procedures under COBRA.


II. DISCUSSION

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant

is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact could not find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. O'Neal v. City of Chicago, 392 F.3d 909, 910-911 (7th Cir. 2004). A nonmoving party cannot rest on mere allegations or denials to overcome a motion for summary judgment; "instead, the nonmovant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004). The nonmoving party must point to enough evidence to show the existence of each element of its case on which it will bear the burden at trial. Celotex v. Catrett, 477 U.S. 317, 322-323 (1986); Lawrence v. Kenosha Cty., 391 F.3d 837, 842 (7th Cir. 2004).


### (A) Mr. Hill's Surreply

Mr. Hill has moved for leave to file a surreply in opposition to Zimmer's reply in support of its summary judgment motion. Mr. Hill proposes to address Zimmer's contention that he failed to comply with Federal Rule of Civil Procedure 56 and Local Rule 56.1 when submitting his response brief. Mr. Hill also wishes to present additional argument relating to the timing of his termination and Zimmer's allegedly inconsistent records of his FMLA use. Because consideration of these issues does not effect the outcome of summary judgment, the court denies Mr. Hill's motion for leave as moot.

*(B) FMLA*

Mr. Hill claims Zimmer discriminated and retaliated against him for taking leave under the FMLA. The FMLA guarantees eligible employees up to 12 weeks of unpaid leave during a one-year period if afflicted with a serious health condition that renders them unable to perform the functions of their job as well as to care for an immediate family member's serious health condition. *See* 29 U.S.C. § 2612(a)(1)(D); *see also* Bhd. of Maint. Way Employees v. CSX Transp., 478 F.3d 814, 816 (7th Cir. 2007). Under the FMLA, it is "unlawful for an employer to interfere with an employee's attempt to exercise any FMLA rights" or "retaliat[e] against an employee who exercises FMLA rights." Burnett v. LFW, Inc., 472 F.3d 471, 477 (7th Cir. 2006). Akin to other discrimination claims, Mr. Hill may proceed under either the direct or indirect method to prove his FMLA claim. Id. at 481; *see also* Buie v. Quad/Graphics, Inc., 366 F.3d 496, 503 (7th Cir. 2004).

*(i) Direct method*

To prevail under the direct method, Mr. Hill must present evidence that he would not have been terminated but for his having taken leave under the FMLA. *See* Radue v. Kimberly-Clark Corp., 219 F.3d 612, 616 (7th Cir. 2000); *see also* Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1146 (7th Cir. 1997). Mr. Hill may demonstrate this casual link using two types of permissible evidence: direct evidence; i.e., "evidence that, if believed by the trier of fact, would prove the fact in question 'without reliance on inference or presumption'" or circumstantial

9

evidence, "i.e., evidence that allows a jury to infer intentional discrimination by the decision-maker." Rogers v. City of Chicago, 320 F.3d 748, 753 (7th Cir. 2003); see also Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir. 1994) (noting that direct evidence generally consists of an admission by the decision-maker that the adverse employment action was "based on the prohibited animus.").

Absent evidence of an outright admission, Mr. Hill may proceed if he can provide circumstantial evidence sufficient to point directly to a discriminatory reason for the termination decision. Ptasznik v. St. Joesph's Hosp., 464 F.3d 691, 695 (7th Cir. 2006); see also Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 939 (7th Cir. 2003); Rhodes v. Ill. Dep't of Transp., 359 F.3d 498, 504 (7th Cir. 2004). Circumstantial evidence of intentional discrimination may include: suspicious timing, statements, or behavior; evidence that similarly situated employees outside the protected class received better treatment; and evidence that the plaintiff was qualified for the job but passed over in favor of a person outside the protected class and the employer's reason for the action is a pretext for discrimination. Sun v. Bd. of Trs. of the Univ. of Ill., 473 F.3d 799, 812 (7th Cir. 2007). Mr. Hill presents no evidence of admissions of discriminatory animus on his supervisors' part. Instead, he tries to construct a "convincing mosaic" of circumstantial evidence to show that his supervisors retaliated against him for taking leave under the FMLA.

Mr. Hill first says the timing of his termination was suspicious because he was fired shortly after returning from FMLA leave. Mr. Hill took leave due to an

injured shoulder three days after the November 8, 2005 machining incident. Mr. Shuman and Mr. Puckett began investigating the incident while Mr. Hill was on leave, and when Mr. Hill returned to work on November 30, Mr. Hill's supervisors held a meeting to discuss the claims against him. Although Mr. Hill argues that this sequence of events is evidence of retaliation, "[t]he mere fact that one event preceded another does nothing to prove that the first event caused the second." Sauzek v. Exxon Coal USA, Inc., 202 F.3d 913, 918 (7th Cir. 2000) (noting that other circumstances must also be present to reasonably suggest that the two events are somehow related). The machining incident that led to the investigation of Mr. Hill's job performance occurred before he took leave, undercutting the argument that he was fired as a direct result of engaging in a protected activity. See Cichon v. Exelon Generation Co., 401 F.3d 803, 811 (7th Cir. 2005) (discounting suspicious timing argument where the plaintiff's unsatisfactory job performance occurred before he engaged in a protected activity). Zimmer's first opportunity to discuss the results of the investigation with Mr. Hill was the day he returned from leave, and Mr. Hill points to no evidence that suggests otherwise. Even if Mr. Hill could connect the timing of his termination to his FMLA leave, suspicious timing alone ordinarily is not enough for an inference of discrimination. Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 981 (7th Cir. 2004) (holding that "mere temporal proximity is not enough to establish a genuine issue of material fact.") (citation omitted). Mr. Hill must rely on additional evidence in order to create a genuine issue of material fact.

11

Second, Mr. Hill argues that Zimmer deducted at least one more week's worth of leave from him than he actually used, suggesting that Zimmer improperly penalized him for his FMLA use. Zimmer responds that Mr. Hill's calculation of total leave doesn't account for leave taken during the Thanksgiving holiday in 2005. The FMLA's implementing regulations state that "the fact that a holiday may occur within the week taken as FMLA leave has no effect; the week is counted as a week of FMLA leave." 29 C.F.R. § 825.200(f). Regardless of the accuracy of Zimmer's deduction, Mr. Hill offers no support for a casual link between an improper deduction and Zimmer's alleged retaliation. Similarly, Mr. Hill claims an inference of retaliation because Zimmer's 2004 employee attendance calendar is missing. Mr. Hill argues that it is reasonable to infer that the calendar wasn't kept in Mr. Hill's personnel file because a missing calendar would reduce the chance of improper deductions from the 2004 FMLA allotment. Mr. Hill offers no evidence in support of his assertions nor demonstrates a casual connection between the 2004 calendar and Zimmer's alleged retaliation.

Mr. Hill next claims Senior Supervisor Rodney Roberts discriminated against him for taking FMLA leave and influenced Zimmer's decision to fire him. Mr. Hill says Mr. Roberts treated him harshly after he took leave for his heart condition in 2002 and this treatment worsened when Mr. Hill took leave to care for his wife in 2004 and 2005. When the machining incident occurred in November 2005, Mr. Roberts was part of the team investigating the matter and had control over the defective parts alleged to have passed through Mr. Hill's

inspection. Mr. Roberts kept the parts in his own office before attending the November 30 meeting at which Mr. Hill was confronted. Mr. Roberts then brought the parts to the meeting and signed off on the resulting Final Written Warning. Based on this evidence, Mr. Hill argues that a material issue of fact exists as to whether Mr. Roberts manipulated the information provided to Mr. Shuman and Mr. Puckett upon which they based their investigation and, eventually, their termination decision.

Although Mr. Roberts did not have the formal authority to terminate Mr. Hill, his alleged bias may nonetheless be imputed to Zimmer if he exerted such singular inference over the investigation as to be regarded as the "true functional decision-maker," or the functional decision-maker's "cat's paw." <u>Brewer v. Bd. of Trustess of Univ. of Ill.</u>, 479 F.3d 908, 917 (7th Cir. 2007) (citing <u>Little v. Ill. Dept. of Revenue</u>, 369 F.3d 1007, 1015 (7th Cir. 2004)). To succeed under the cat's paw theory, Mr. Hill must show that Zimmer was wholly dependent on Mr. Roberts to supply the information upon which it based its termination decision. <u>Brewer v. Bd. of Trustees</u>, 479 F.3d at 918. For example, the requisite degree of influence may be found where an employee supplies misinformation or fails to provide relevant information to the decision maker. <u>Id.</u> at 917.

> "By contrast, where a decision maker is not wholly dependent on a single source of information, but instead conducts its own investigation into the facts relevant to the decision, the employer is not liable for an employee's submission of misinformation to the decision maker. It does not matter that in a particular situation much of the information has come from a single, potentially biased source, so long as the decision maker does not artificially or by virtue of her

role in the company limit her investigation to information from that source."

Id. at 918 (citations omitted).

Mr. Shuman and Mr. Puckett conducted their own investigation of the November 8 incident and inspected the defective parts at issue. This investigation was no "mere paper review" of Mr. Roberts' recommendation; Mr. Shuman and Mr. Puckett sought out other sources of information, including an explanation from Mr. Hill himself. Mr. Shuman and Mr. Puckett considered and independently rejected Mr. Hill's demonstration of how he conducted his inspection. Further, Mr. Hill points to no evidence that Mr. Roberts manipulated the physical evidence to make Mr. Hill's error appear much more severe than the correct parts would indicate. In fact, Mr. Hill testified at his deposition that he noticed the grooves in the defective parts when they were machined and placed them on hold because of this defect. Mr. Hill hasn't produced evidence sufficient to conclude that Zimmer should be liable for Mr. Roberts' alleged bias against Mr. Hill.

Mr. Hill also attempts to rely on circumstantial evidence that Zimmer inconsistently applied its progressive disciplinary policy by treating employees who hadn't used FMLA leave more favorably than employees who had taken leave. Three other machinists received lesser discipline than Mr. Hill for production errors, but those employees did not commit the same policy violations as Mr. Hill. Roger Emley received only a verbal warning after producing twelve nonconforming parts even though he worked in the same department during the same shift and

was subject to the same supervisors as Mr. Hill. Mr. Emley's infraction, however, involved only a single production incident rather than verification of an MIS inspection. Dan Serna, another employee in Mr. Hill's department, produced and passed a defective part through inspection but wasn't disciplined. Similar to Mr. Emley, Mr. Serna's performance issues didn't involve an MIS inspection verification. Finally, Mr. Hill claims that first shift machinist Mark France produced and then failed to uncover eight wrong parts but received no discipline. Unlike Mr. Hill, Mr. France's infractions didn't involve inspection verifications. None of these employees are similarly situated to Mr. Hill in terms of job performance. *See* Radue v. Kimberly-Clark Corp., 219 F.3d at 617-618 (holding that "in disciplinary cases - in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason - a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct.").

To the contrary, Zimmer terminated two other employees, Ronald Grube and William Helms, who committed the same violation as Mr. Hill by twice signing off on an MIS inspection sheet verifying an inspection that they either did not perform or performed in a grossly negligent manner. Mr. Hill questions Mr. Helms' termination, claiming that Zimmer did not fire Mr. Helms until five years after his second Final Written Warning. Zimmer states that although Mr. Helms had earlier performance issues, it terminated Mr. Helms after he committed the same violations as Mr. Hill. Regardless of whether Zimmer terminated Mr. Helms

immediately following his second Final Written Warning, Mr. Hill hasn't produced evidence about Mr. Helms' FMLA use, so he hasn't come forth with evidence from which a reasonable trier of fact could find that similarly situated employees outside the protected class received better treatment.

Finally, Mr. Hill maintains that Zimmer knowingly caused the notice of his COBRA rights to be sent to the incorrect address, thus supporting an inference of retaliatory motive. Assuming for purposes of this argument that Zimmer provided an address to the COBRA administrator knowing that it was incorrect, that could not establish a casual link between Mr. Hill's FMLA leave and his termination. No reasonable trier of fact could find, based on the summary judgment record, that Zimmer would not have fired him but for the fact that he took leave under the FMLA. In fact, Zimmer asserts that it would have fired Mr. Hill regardless of his leave because of his performance problems.

Looking at the totality of the circumstances, Mr. Hill's presentation of circumstantial evidence does not establish a reasonable inference of causation. Mr. Hill has not satisfied his burden under the direct method of proof.

*(ii) Indirect method*

Although Mr. Hill cannot prevail under the direct method of proof, he may establish a prima facie case of retaliation under the indirect method by demonstrating that: (1) he was engaged in a statutorily-protected activity; (2) he performed his job according to Zimmer's legitimate expectations; (3) he suffered an adverse employment action; and (4) only he, and not any similarly situated

employee who did not take FMLA leave, was subjected to an adverse employment action. *See* Hill v. Stoughton Trailers, LLC, 445 F.3d 949, 951 (7th Cir. 2006); s*ee also* Stone v. City of Indianapolis, 281 F.3d at 644. Unlike the direct method of proof, Mr. Hill need not "show even an attenuated causal link" to establish a prima facie case under the indirect method. Id. If Mr. Hill is successful in establishing a prima facie case, the burden of proof shifts to Zimmer to articulate a legitimate, nondiscriminatory reason for terminating Mr. Hill. Id. In turn, Ms. Hill must prove that Zimmer's proffered reason is a pretext for discrimination. Id.

It is undisputed that Mr. Hill engaged in a protected activity by taking leave under the FMLA and that his termination was an adverse employment action. In deciding whether Mr. Hill established a prima facie case, then, the court need only focus on whether Mr. Hill was performing up to Zimmer's legitimate expectations and whether he can point to any similarly-situated employees who were treated more favorably. Zimmer claims Mr. Hill can't show he was meeting its legitimate expectations because of the performance problems that led to Mr. Hill's termination. Mr. Hill, on the other hand, argues that he was not a discipline problem for Zimmer and that the earlier warning should have been rolled off his record after a year. While Mr. Hill acknowledges that Zimmer doesn't roll off all discipline depending on the nature and pattern of the violation, he claims that Zimmer didn't necessarily consider an employee with two Final Written Warnings to be performing outside its expectations, as shown by Zimmer's failure to fire Mr. Helms immediately after receiving two warnings. Mr. Hill's self-serving statements

17

about his ability are not enough, standing alone, to dispute Zimmer's contrary conclusions. Gustovich v. AT&T Comm'ns, Inc., 972 F.2d 845, 848 (7th Cir. 1992). Mr. Hill doesn't dispute having received two warnings, so he hasn't shown that he was meeting Zimmer's performance expectations.

Even if Mr. Hill could establish that he was meeting Zimmer's expectations, he must point to a similarly situated employee who received more favorable treatment but was a member of the protected class. *See* Radue v. Kimberly-Clark Corp., 219 F.3d at 617. A similarly situated employee must be "directly comparable in all material respects." Grayson v. O'Neill, 308 F.3d 808, 819 (7th Cir. 2002); Snipes v. Ill. Dept. of Corr., 291 F.3d 460, 463 (7th Cir. 2002). As already discussed, Mr. Hill has not produced evidence that other employees "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Radue v. Kimberly-Clark Corp., 219 F.3d at 617-618. Moreover, Mr. Hill offers no response to Zimmer's claim that his replacement, Michael Mitchell, took FMLA leave twice and for nearly a month within the six months before he replaced Mr. Hill. Mr. Hill has not presented a prima facie case of retaliation under the indirect method. *See* Kriescher v. Fox Hills Resort and Conference Ctr., FHR, Inc., 384 F.3d 912, 916 (7th Cir. 2004) (holding that the plaintiff could not out a prima facie case of retaliation without identifying a similarly situated employee).

Further, Zimmer presented a legitimate nondiscriminatory reason for terminating Mr. Hill — Mr. Hill's performance problems — and Mr. Hill has not

produced evidence sufficient to allow a finding that this reason was a pretext for discrimination. To show pretext, Mr. Hill must demonstrate that Zimmer gave a dishonest explanation for its actions. *See* Grube v. Lau Indust., Inc., 257 F.3d 723, 730 (7th Cir. 2001) (pretext "means something worse than a business error; pretext means deceit used to cover one's tracks."). Mr. Hill hasn't produced sufficient evidence that Zimmer acted for a forbidden reason or that its proffered reason for terminating him was false. Rather, Mr. Hill relies on the same circumstantial evidence as set forth above to show that Zimmer's reason had no basis in fact. As already noted, this evidence doesn't raise a genuine issue of material fact as to whether Zimmer's decision was deceitful or motivated by retaliatory animus.

If Zimmer acted in good faith, the court cannot second-guess its actions regardless of whether Zimmer was correct in its beliefs. Green v. Nat'l Steel Corp., 197 F.3d 894, 899 (7th Cir. 1999); Debs v. Northeastern Ill. Univ., 153 F.3d 390, 396 (7th Cir. 1998) (even a foolish, trivial, or even baseless decision, if honestly believed by the employer, is not pretextual). Courts cannot impose on employers their own ideas of what constitutes a prudent business decision; they "can assess only the question [of] whether an employer has taken an action for a forbidden reason." Leonberger v. Martin Marietta Materials, Inc., 231 F.3d 396, 399 (7th Cir. 2000). Mr. Hill hasn't presented evidence that tends to show that Zimmer didn't act in good faith by terminating him for poor performance. Accordingly, Mr. Hill

hasn't presented sufficient evidence of retaliation to create a genuine issue of fact for trial, and Zimmer is entitled to summary judgment on Mr. Hill's FMLA claims.


### (C) COBRA

Lastly, Mr. Hill contends that Zimmer knowingly caused his COBRA notice to be sent to the wrong address, causing the denial of health care benefits for which he otherwise would have retained coverage. COBRA requires group health plan sponsors to provide notice to each qualified beneficiary who, as the result of a qualifying event, such as termination, would lose coverage to elect to continue coverage. 29 U.S.C. § 1161. Upon the occurrence of a qualifying event, "the employer of an employee under a plan must notify the administrator . . . within 30 days . . . of the date of the qualifying event . . . ." 29 U.S.C. § 1166(a)(2). The administrator must then notify the qualified beneficiary of his COBRA rights, within 14 days of receiving notification from the employer. 29 U.S.C. § 1166(a)(4).

"Notification methods that are reasonably calculated to reach the former employee satisfy the standard good faith compliance with the statute." Keegan v. Bloomingdale's, Inc., 992 F. Supp. 974, 978 (N.D. Ill. 1998). The issue is not whether the former employee actually received the notice but whether the notice was sent in a good faith manner reasonably calculated to reach the former employee. Id. at 977-978. It is the plan administrator, not the employer, that "bears the burden of proving that adequate notice of COBRA rights was provided to the former employee." Id; Wagner v. Access Cash Intern. Inc., 212 F. Supp. 2d

886, 892 (C.D. Ill. 2002) (noting that employers are not required to ensure that plan participants actually receive their COBRA notices but, rather, are required to operate in good faith compliance with a reasonable interpretation of what adequate notice entails).

Mr. Hill maintains that, in October 2005, he told one of his supervisors that his house had burned down and provided the supervisor with his new address. After Mr. Hill was fired in December 2005, Zimmer notified COBRA Compliance Manager Jason Trimble of this qualifying event. The third party plan administrator then sent notice to Mr. Hill's old address. Mr. Hill claims he never received the notice and that he contacted Mr. Shuman numerous times to discuss his health care coverage, with no response. Based on this evidence, Mr. Hill argues that there is a material issue of fact as to whether Zimmer knowingly provided the plan administrator with the incorrect address information.

Mr. Hill hasn't offered any evidence that Zimmer failed to make a good faith attempt to notify the plan administrator of the qualifying event in question. Zimmer advised Mr. Trimble of Mr. Hill's termination, and the plan administrator sent the notice to an address that Mr. Hill had previously provided. Although Mr. Hill argues that he informed Zimmer of his address change prior to his termination, he has not demonstrated that Zimmer had actual knowledge that the plan administrator failed to notify Mr. Hill of his COBRA rights. In fact, Mr. Hill himself continued to use his old address after his termination, including on his EEOC Charge of Discrimination filed in March 2006. *See* <u>Killis v. Medieval</u>

Knights, LLC, 2007 WL 4302470, at *2 (N.D. Ill. Dec. 4, 2007) (holding that the plaintiff's concession that he was receiving mail at his prior address destroyed his claim that his COBRA notice was sent to the wrong address). Moreover, Mr. Hill doesn't refute Zimmer's claim that he failed to follow the standard procedure for an address change. Mr. Hill's conclusory statements do not show that Zimmer failed to provide notice in a manner reasonably calculated to reach Mr. Hill. Zimmer is entitled to summary judgment on Mr. Hill's COBRA claim.


III. CONCLUSION

For the foregoing reasons, the court GRANTS Zimmer's motion for summary judgment. [Doc. No. 46] and DENIES Mr. Hill's motion for leave to file surreply as moot [Doc. No. 55]. The clerk shall enter judgment accordingly.

SO ORDERED.

ENTERED:  February 25, 2008


    /s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

22